IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

YVONNE OLSON,

                             Plaintiff,                           OPINION AND ORDER

     v.

                                                       15-cv-172-wmc

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                             Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Yvonne Olson seeks judicial review of a final decision of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, which denied her application for Social Security Disability Insurance Benefits. In her appeal, plaintiff raises four challenges. The court held a telephonic hearing on Olson's appeal. For the reasons provided below, the court will affirm the Commissioner's determination, enter judgment in defendant's favor, and close this case.

BACKGROUND

A. Overview of Claimant

Olson was 55-years-old at the (amended) alleged onset date; 55 at the time she applied for benefits; and 60 at the time of the second hearing. She has a high school education, is able to communicate in English, and has past work experience as a cashier and bill collector, among other jobs. Olson last worked in 2009 as a cashier at a gas station. She claims disability based on a variety of physical ailments, including asthma, high blood pressure, coronary artery disease, dizziness, headaches, goiter and fractured wrist. The focus of the appeal, however, is on her somatoform disorder.

## B.  Medical Record

The medical record contains several reports from psychologists evaluating Olson's neuropsychological state and mental health complaints.  A January 13, 2011, report, by Tammy L. Hietpas-Wilson, Ph.D., notes that Olson "reported the onset of cognitive difficulties following her heart surgery in 2006," specifically noting forgetfulness, difficulty with attention and concentration, slower processing speed, and problems with fine motor coordination and weakness in both hands. (AR 496.)  Hietpas-Wilson reviewed her medical, family and social history. (AR 496-97.)  Hietpas-Wilson also conducted a variety of mental examinations and motor tests.  (AR 497-99.)  As for the test interpretation, the "[r]esults of the intellectual testing revealed verbal abilities at the high end of the low average range."  (AR 500.)  As for cognitive functioning tests, "Olson evidenced slow processing speed and mildly impaired phonemic fluency," though her "semantic fluency is within normal limits."  (*Id.*) Other cognitive testing results were average or within the normal range.  (*Id.*)  Motor testing demonstrated "mild impairment in manual dexterity and strength in her left hand and fine motor slowing in the borderline range for her left hand." (*Id.*)  (She's left-handed.)  There was no sign of slowing in her right hand, but "her manual dexterity and strength were low average on her non-dominant side."  (*Id.*)

With regard to psychological functioning, Hietpas-Wilson stated that the "results of the MMPI-2 were invalid as she responded in a manner suggesting of trying to create a favorable impression or denying/repressing psychological distress."  (AR 500.)  As part of that assessment, Hietpas-Wilson stated, "[h]er responses indicate a highly unusual degree or combination of somatic complaints, even in individuals with genuine health problems." (AR 501.)

In summarizing her impressions, Hietpas-Wilson noted "[i]nterview and test data revealed a talkative almost attention seeking woman with impaired processing speed and phonemic fluency." (*Id.*) Hietpas-Wilson also noted impairment/decline in her left hand. Still, she performed within normal ranges on various cognitive skills. Hietpas-Wilson concluded:

> Psychological testing showed a preoccupation with somatic complaints and an absence or denial of psychological distress. Her impairments in processing speed and motor functioning are most likely residual sequelae of her CABG [heart condition], but may also reflect some exaggeration. Her perception that her problems have worsened may reflect a greater awareness/preoccupation with her residual problems, which is colored by a histrionic personality style.

(*Id.*)

Hietpas-Wilson also completed a January 2012 report, the purpose of which was to "rule out the presence of a neurodegenerative process in addition to cognitive dysfunction from the CABG." (AR 931.) Hietpas-Wilson concluded that "[g]iven the patient's report of stable cognitive functioning, additional cognitive testing is not warranted. At the present time, it does not appear that she has a neurodegenerative disease process and her deficits are like[ly] due to CABG." (AR 931-32.)

In an April 10, 2012 report, Rebecca Angle, Ph.D., conducted a mental status evaluation and administered the Wechsler Memory Scale, 4th Edition (WMS-IV). (AR 322.) In the description of history, claimant denied that she experiences symptoms of depression or anxiety. Angle also noted that Olson has never been hospitalized for mental health issues. (AR 322.) The test results were within the low average to average range. (AR 324.) "Results of the memory testing indicate that overall the claimant's abilities are

within the average range of functioning." (AR 325.) Dr. Angle stated that "the claimant does not appear particularly motivated to work." (AR 325.) She also stated that Olson's "prognosis with regard to her mental health is judged to be good. She identified no diagnosis on Axis I or II and for Axis III, said "see current medical treatment notes." Angle believed that Olson "would likely have the ability to understand, remember, and carry out simple instructions that might be given to her," but that she would need assistance in managing funds. (AR 325-26.)

Critical to Olson's appeal, Steven Benish, Ph.D., issued a report on June 2, 2014, based on his consultative examination of Olson. Benish noted that "[p]ast psychiatric and psychological evaluations have described the claimant's behavior in terms of 'attention seeking', somatization, and 'histrionic personality style'." (AR 854.) Benish described Olson's attitude, speech, mood and affect, and asked her about various symptoms. Benish also asked Olson about her activities of daily living and social functioning, and examined her persistence and pace. (AR 855-56.)

Benish administered the Wechsler Adult Intelligence Scale IV text and described the subtest results, concluding: "The claimant's results indicate intellectual functioning in the low average range compared to same age peers. Across 5 indices, the claimant consistently scores in this average-to-low average range. The results do not indicate any significant deficits in verbal comprehension, perceptual reasoning, working memory, processing speed, or full scale IQ." (AR 856.)

In the "summary and diagnoses" section of the report, Benish noted that claimant believes there is a problem with her processing speed "[d]espite multiple examiners and reports indicating no major neurocognitive problems." (AR 857.) "One reasonable

explanation is that the claimant experiences somatic symptoms that are distressing to her, experiences ruminative thoughts, feelings, and behaviors related to the somatic complaints, experiences persistent anxiety about health symptoms, and as a result devotes much time and energy to the symptoms. These symptoms fulfill criteria for Somatic Symptom Disorder of a persistent nature." (AR 857.) Benish went on to explain, "Somatic Symptom Disorder does not presume malingering or factitious behavior, and does require a rule out of medical etiology for the symptoms." (AR 857.) Benish also noted that "the claimant does experience persistent anxiety that fulfills criteria for generalized anxiety disorder." (AR 857.)

With respect to her work capacity, Benish concluded that Olson "has most abilities intact to understand, remember, and carry out simply instructions;" "has some discord in relationships with supervisors and coworkers;" "mild problems in concentration, attention, and work pace;" and "moderate abilities to respond to stressors." (AR 857.) Benish included diagnoses for both 300.82 Somatic Symptom Disorder and 300.02 Generalized Anxiety Disorder. (AR 857.)

Material to the RFCs, the state agency doctors concluded that Olson was capable of medium exertional level work. (AR 355-63, 434-441.)

In addition to the medical record, the ALJ had an independent medical expert, Dr. Lynch, a psychologist, testify at the hearing. Lynch reviewed all of the exhibits in this case. Lynch testified that somatization "may be a reasonable explanation for the amount of physical complaints absent underlying pathology that might explain them medically." (AR 588.) He concluded that "there is no medically determinable impairment," because none of the psychological evaluations found mental memory, cognitive impairment. (*Id.*) Lynch

also stated, "I have considered, and, you know, as a rule out, she would fit under 1.07 somatoform disorders.  There is no diagnostic test for this.  But once again, Benish[] found the same thing."  (AR 589.)  In response to claimant's counsel's questions, Lynch acknowledged that there is no treatment for somatoform disorder -- the focus being on educating the patient -- and that in the face of such complaints, "one would then ask, well, how does it really affect one on a day-to-day basis and similarly, under concentration, it doesn't appear to interfere on a day-to-day basis."  (AR 593.)

## C. ALJ's Decision

The ALJ found several severe impairments:  history of heart disease status post 2006 coronary artery bypass graft ("CABG"), fibro muscular dysplasia of the internal carotid arteries, benign positional vertigo, hypertension, asthma and obesity.  (AR 543.)  In setting forth these severe impairments, the ALJ also found that Olson's claims of chronic kidney disease, mild carpal tunnel syndrome, history of mini-strokes and gout did not constitute severe impairments.  (AR 544.)  Olson does not challenge these findings, instead focusing her appeal on his rejection of her complaints of cognitive and somatic complaints.

With respect to Olson's claim of a somatoform disorder, the ALJ placed some weight on Angle's April 2012 report, describing it as "objective testing was all within the average to low average range and she still completed a wide range of daily activities in a timely manner leading the doctor to conclude there was no mental diagnosis."  (AR 544.)  The ALJ placed "less" weight on Dr. Hietpas-Wilson's January 2011 and January 2012 reports, finding (1) that while Hietpas-Wilson diagnosed Olson with a cognitive impairment in January 2011 she found the MMPI-2 testing invalid; and (2) in the January 2012 report,

Hietpas-Wilson concluded that her cognitive impairment was "stable" and that the claimant "has no functional limitations," which the ALJ found "somewhat contradictory." (AR 545.)

For Dr. Benish, the ALJ stressed Benish's statements that Olson's "past mental evaluations revealed 'attention seeking,' somatization, and a 'histrionic personality style,'" but still acknowledged Benish's diagnoses of a somatic symptom disorder and generalized anxiety disorder. (AR 545.) As for those diagnoses, the ALJ stated, "Benish also contradicted himself and declined to provide actual objective medical evidence that would substantiate a medically determinable mental impairment." (AR 545.) The ALJ explained that the testing showed "no major neurocognitive problem, but she thinks she does." (AR 545.) As such, Benish's conclusions were based on "claimant's self-reports" rather than "objective medical findings and medical observations." (AR 545.)

The ALJ then reviewed Dr. Lynch's testimony during the hearing. The ALJ describes Lynch's testimony as claimant's psychological examinations were "within the normal range of testing." (AR 546.) The ALJ further described Lynch's testimony as "the claimant's historical record may indicate some minor impairment, but that everyone has some ups and downs, and there is nothing in the record to suggest an impairment warranting cognitive testing . . . . Dr. Lynch explicitly testified that there was no medically determinable mental impairment." (AR 546.) The ALJ found Lynch's testimony "more persuasive than the other opinions because the doctor was able to review all the evidence and sworn testimony, and has known strong credentials in the psychological field." (AR 546.) Lynch also testified, according to the ALJ, that there is no evidence that a medically

determinable mental impairment is severe in light of her daily activities, ability to get along with others, and normal evidence of concentration, persistence and pace. (AR 546.)

The ALJ's RFC limited Olson to medium work, with additional restrictions: of avoiding hazardous heights and dangerous machinery, heavy concentrations of dusts, fumes, gases, odors and chemicals; limited to occasional balancing and climbing of ramps and stairs; limited to frequent stooping, kneeling, crouching and crawling; able to understand, carryout and remember routine work with a general education development reasoning level of 4 or less; able to consistently and appropriately relate to supervisors, coworkers and the public; would be off task less than 10% of the workday; limit fine finger manipulation to frequent, but no limit on gross handling. (AR 547.)

In making this determination, the ALJ reviewed Olson's testimony about poor memory, uncontrollable hands, dizziness, difficulty walking, poor memory and comprehension, inability to grasp and lift objects, inability to sit for more than 15 minutes, stand for more than 10 minutes, and the need to take breaks walking even short distances, frequent headaches and the need to elevate her feet. (AR 547.) The ALJ used the familiar "not entirely credible" language to discount her testimony. In particular, in finding Olson not credible, the ALJ relied on the fact that claimant's physical ailments (in particular her heart problem) were "all present at approximately the same level of severity prior to the alleged onset date," and "also were present well before she stopped working at the level of substantial gainful activity in 2010." (AR 547.) The ALJ also pointed out that she has admitted to applying for jobs -- and collected unemployment compensation -- indicating an ability to perform work. (AR 547.) (Though the court notes that Olson's unemployment compensation was in 2010, 2011.) The ALJ also pointed to evidence in

the record in which she had described "ability greater than those alleged at the hearing," in particular about her ability to lift, stand, walk and use of fine fingering for sewing. (AR 547-48.)

The ALJ maintained his prior opinion that Olson "remains able to sustain her past relevant work as a cashier both as she actually performed it and as it is generally performed." (AR 552.) In the alternative, the ALJ concluded that "there are other jobs existing in the national economy that she is able to perform." (AR 552.) Because the ALJ placed additional limitations on the RFC of medium work, the ALJ stated that he "asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity," and that the VE testified that she could perform occupations such as assembly, machine tender and office helper. (AR 553.)

## OPINION

Olson raises four challenges on appeal: (1) the ALJ erred in finding that Olson could perform "past relevant work;" (2) the ALJ erred in holding alternatively under step five that Olson could perform other work in the economy, because the ALJ failed to consider Olson's age of 60 at the time of the second hearing; (3) the ALJ failed to properly evaluate somatoform disorder; and (4) ALJ erred in his credibility determination. Because the issues are related, the court will consider the first two together and the latter two together.

## I. Treatment of VE's Testimony

The first two challenges concern the ALJ's treatment of the VE's testimony and his alternative findings that Olson could perform both past relevant work and other work in

the national economy.  As for the ALJ's finding at step four about her ability to perform past relevant work, Olson argues that for her work as a cashier to qualify as "past relevant work" it must be substantial gainful activity (SGA) done within the past 15 years that lasted long enough for the claimant to learn how to do the job.  *See* 20 C.F.R. § 404.1560(b)(1).  Olson contends that the record does not demonstrate that her earnings as a cashier in 2008 and 2009 was above the level of SGA.  As detailed in her brief, the record of evidence of earnings is a summary of earnings covering all of Olson's jobs that does not break out the income earned as a cashier.  (Pl.'s Opening Br. (dkt. #9) 3 (citing AR 181, 213).)  Olson further contends that as a cashier, she was working four hours a day, five days a week at $8.00 per hour, and assuming 4.3 weeks in a month, she would have earned $693.28 per month, which is below the SGA limit for all years since 1999.  (*Id.*)  As such, Olson argues that her cashier work was not SGA, and therefore the ALJ erred in relying on it to find that she could perform past relevant work.[1]

In response, the Commissioner acknowledges that while the record "does not conclusively show that Plaintiff only worked as a cashier during this time, a reasonable person could conclude that she was working as a cashier at this time given her work history reports, earning records, and hearing testimony."  (Def.'s Opp'n (dkt. #16) 13.)  While

---

[1] At step 4, Olson also challenges the ALJ's past relevant work analysis, even assuming her cashier work would satisfy past relevant work.  Olson argues that under *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984), and *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991), the ALJ failed to "specify the duties involved in a prior job and assess the claimant's ability to perform the specific tasks."  (Pl.'s Opening Br. (dkt. #9) 5.)  The VE's testimony at the hearing however, undermines this argument.  The ALJ described a cashier job as "light, SVP-2, unskilled."  (AR 596.)  The ALJ then described a hypothetical RFC that mirrors the one he adopted.  (AR 597-98.)  The VE then testified that with that RFC, an individual could perform a cashier job.  (AR 599.)  This exchange appears to satisfy the requirement.

plaintiff's argument may have some merit, the court need not rule on this challenge, assuming the ALJ's alternative holding at step 5 was not in error.

The crux of Olson's challenge to the ALJ's alternative holding that she could perform other jobs is that the VE's testimony failed to establish that there were sufficient medium exertion jobs Olson could perform that would accommodate the additional restrictions in the RFC. The VE gave numbers for three different jobs and broke down those numbers by medium and light exertional requirements. (AR 599.) Olson's counsel asked the VE for the DOT numbers for the occupations the VE identified. The VE then provided numbers "as example[s]." (AR 601.) The representational numbers all correspond with light or sedentary exertional levels. (Pl.'s Opening Br. (dkt. #9) 6.) From this, Olson appears to reason that her RFC should have required light work, and if it had -- given her age -- under the medical-vocational guideline, she would have been deemed disabled. (*Id.* at 7.)

This argument is too clever by half. Critically, the VE testified as to the number of jobs for the three identified occupations at both light and medium exertional levels. Moreover, because the ALJ concluded that Olson is capable of medium exertional work -- a finding that Olson does not challenge, other than to challenge the ALJ's rejection of her somatoform disorder as a severe impairment -- it is not clear how the ALJ could have erred in considering the availability of light exertion jobs in the national economy. If the ALJ had determined that Olson could only perform light work (and assuming she was not disabled under a grid), then considering the availability of jobs requiring a more rigorous level of exertion would have constituted error, but that is not what happened here. As best as the court can determine, Olson is trying to argue that the consideration of light exertion level jobs should alter her RFC to limit her to light work, and if she is limited to light work,

then she is disabled under the Medical-Vocational guideline. This logic does not hold together.[2] As such, the court finds that the ALJ's determination that Olson could perform other work, and the ALJ's reliance on the VE's testimony of sufficient numbers of other jobs Olson could perform that other work, is not in error.

## II.   Credibility Determination; Treatment of Somatoform Disorder

Plaintiff's third and fourth challenges are also related. She challenges the ALJ's rejection of a somatoform disorder as a severe impairment and the ALJ's discrediting of Olson's testimony about her limitations. Somatoform disorders are defined as "[a] group of closely related mental illnesses characterized by distressing physical symptoms that lack a physical cause and arise instead from emotional conflict or anxiety." American Medical Association, *Complete Medical Encyclopedia* 1142 (2003); *see also Adaire v. Colvin*, 778 F.3d 685, 686 (7th Cir. 2015) (describing a somatoform disorder as a "mental condition that causes pain that has no known physical cause").

The Seventh Circuit instructs that an ALJ cannot reject a claim of disability because of a lack of "objective" evidence where the claimed impairment cannot be proven by such evidence. *Adaire*, 778 F.3d at 687 (citing cases). Here, the ALJ erred in finding that Olson's claimed somatoform disorder was not a medically determinative disorder or discounting it because it was a "rule-out" disorder. By its very definition, somatoform disorder is a disorder where there is no physical cause, where physical causes have been ruled out, and

---

[2] Olson also raises an argument in a footnote challenging the validity of the VE's data. (Pl.'s Opening Br. (dkt. #9) 7 n.5.) This argument is not sufficiently developed to warrant consideration.

where there is a lack of "objective" medical evidence. Under the ALJ's logic, the very nature of the disorder would render it non-disabling.

Still, as plaintiff recognizes even if she suffers from the disorder, Olson must prove that it limits her in such a way that she cannot work. *See Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993) ("While the law requires an ALJ to weigh all the credible evidence and make unbiased factual findings, it does not compel an ALJ to accept wholly the claimant's perception of a disability."). Here, Olson claims cognitive limitations, including problems with processing and memory, as well as dizziness. While she may genuinely feel that she has these limitations, the tests performed by various medical providers, as detailed above, demonstrated that her processing and memory skills were within the normal range of results, and she passed a tilt-table test limiting any concern about her complaint of dizziness.

Furthermore, because "there is always a risk that the patient is a malinger, the ALJ must of necessity base a decision on the credibility of the claimant's testimony." *Sims v. Barnhart*, 442 F.3d 536, 537-38 (7th Cir. 2006). Here, the ALJ discounted Olson's claims of limitations based on findings that she claimed the same physical ailments, in particular her heart problem, during the time she was working at the level of substantial gainful activity and she admitted to applying for jobs past her claimed disability on set date, and that the physical exertion and movement she needs to perform her daily activities and her past description of her abilities are greater than that described during her testimony. The court finds no error in the ALJ's credibility determination.

Accordingly, while the court credits, or at least assumes for purposes of this opinion, that Olson suffers from a medically-determinable impairment, she has failed to point to

evidence to support any finding of work-related limitations, at least beyond those found by the ALJ in crafting an RFC, and, indeed, the evidence in her record undermines such a finding of limitations.

## ORDER

Accordingly, IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Commissioner of Social Security, denying plaintiff Yvonne Olson's application for disability benefits is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 21st day of September, 2017.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge